**UNITED STATES of America,**
**Appellee,**

v.

**Joseph A. WILKERSON, Appellant.**

**No. 72-1425.**

United States Court of Appeals,
Eighth Circuit.

Submitted March 13, 1973.

Decided May 11, 1973.

Rehearing and Rehearing En Banc
Denied July 10, 1973.

H. Carl Runge, Jr., East St. Louis, Ill., for appellant.

Richard K. Coffin, Dept. of Justice, St. Louis, Mo., for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, and MEHAFFY and HEANEY, Circuit Judges.

## PER CURIAM.

Defendant, Joseph A. Wilkerson, was charged in a one-count information with possession with intent to distribute forty-nine pounds of marijuana in violation of 21 U.S.C. § 841(a)(1). Preliminary to trial, two motions to suppress were filed and overruled by Chief Judge Meredith of the United States District Court for the Eastern District of Missouri. Upon trial to a jury defendant was found guilty and sentenced to a term of five years in the custody of the Attorney General. We affirm the judgment of conviction.

The crucial issues at the trial and on this appeal involve a warrantless search in the San Diego, California International Airport and the subsequent warrantless arrest, search and seizure at Lambert Field, St. Louis, Missouri.

There is very little dispute concerning the facts which we briefly summarize. On the night of Saturday, April 1, 1972 a young unidentified female purchased a ticket in the San Diego, California International Airport to travel on American Airlines flight #88 which was scheduled to depart momentarily. The woman checked a suitcase and a duffel bag through to her destination, St. Louis, Missouri, and then asked directions to the restroom. After the plane had left the airport loading gate, airline officials learned that the unidentified woman had not boarded the plane. Since American Airlines' regulations require that a passenger accompany his checked luggage and since the woman partially fit the passenger security profile, American's San Diego Supervisor of Airport Services recalled the plane before it took off. The suitcase and duffel bag checked by the young woman were removed from the aircraft and it was allowed to depart.

Pursuant to American Airlines' security regulations, the removed luggage was taken by airlines employees to the baggage area for inspection. Upon opening the suitcase [1] the airline employees observed some opaque green plastic bags which appeared to contain many brick-shaped objects. On one corner of one of the plastic bags there was a small tear surrounded by traces of vegetable matter. At this point the airlines employees left the suitcase open and called the airport office of the San Diego Harbor Police. When the San Diego officer arrived in the luggage area the appearance of the open suitcase convinced him that the luggage contained several bricks or kilos of marijuana. The San Diego officer felt the outline of the plastic bags and of the duffel bag to ascertain the number of kilos contained in the luggage. The officer also called in a state narcotics agent who, by similar observation, confirmed the San Diego officer's conclusions. The luggage was then impounded by the police to await transshipment the following day. By use of special expediting tags the luggage was forwarded to St. Louis. The luggage arrived in St. Louis in the early morn-

---

1. The airline employees' search of the suitcase was facilitated by the use of a skeleton key. The duffel bag, however, was never opened in San Diego because it was secured by a padlock. The primary inspection of the duffel bag for explosives was accomplished by the somewhat bizarre procedure whereby a baggage attendant ran with the duffel bag for about four feet and hurled it onto the concrete floor. As explained by the baggage attendant, who was fortunately still available at the time of the trial to testify, this procedure was not contemplated by airline regulations but was instead his own personal "shock" treatment.

ing hours of Monday, April 3. Shortly thereafter the baggage was claimed by defendant who was arrested by waiting police officials as he carried the luggage out of the airport. Upon arresting the defendant, the police officers opened the suitcase and, with defendant's consent, broke open the padlock on the duffel bag. It is stipulated that the luggage contained some forty-nine pounds of marijuana.

■ *The San Diego Search.* Defendant concedes that the recall of the plane and the initial search of the luggage for guns or explosives was justified by the necessity to protect life and property from the apparent threat of violence. Defendant contends, however, that this initial search by airline employees was, in legal effect, a governmental search because of the federal government's regulatory involvement in commercial airline security. We have recently been confronted with this same argument on two separate occasions and on both occasions we rejected the claim raised here by defendant. United States v. Echols, 477 F.2d 37 (8th Cir. 1973); United States v. Burton, 475 F.2d 469 (8th Cir. 1973). These two cases stand for the proposition that searches of luggage by airline employees are private searches that are invulnerable to fourth amendment attack so long as the searches are conducted by the carrier for its own purpose and without the instigation or participation of government officers. We will not burden this opinion with a repetition of the analysis in those two cases, which is dispositive of the argument made by defendant here.[2]

■ *The St. Louis Search.* Defendant's primary challenge to the St. Louis arrest, search and seizure is that they are fruit of the poisoned tree, the allegedly invalid San Diego search. This argument, of course, is disposed of by

our conclusion that the San Diego search was proper. Defendant raises a second argument with respect to the St. Louis arrest, search and seizure. According to this argument the police officials in St. Louis had sufficient time to obtain a warrant to search and seize the luggage. While we doubt that the span of time from sometime Sunday morning to early Monday morning is sufficient to automatically require a warrant, we find it unnecessary to decide this issue. Defendant concedes that the search in San Diego, if valid, gave officials in St. Louis probable cause to arrest the defendant. Further, defendant concedes that the difficulties inherent in obtaining a "John Doe" warrant made the warrantless nature of the arrest reasonable. Since these factors compel the conclusion that the arrest of defendant was legal, we sustain the legitimacy of the St. Louis search and seizure as a search and seizure incident to a lawful arrest.

■ Defendant also argues that the district court erred in allowing the government to introduce testimony about the resale value of forty-nine pounds of marijuana. This testimony about monetary value, of course, was relevant to the intent of the defendant. From the proof regarding value the jury could infer whether defendant possessed the marijuana with intent to distribute or merely with the intent to use the contraband himself.[3] As was said in United States v. Mather, 465 F.2d 1035 (5th Cir. 1972):

"The question of the validity of the inference turns on whether the amount of cocaine was such as will support an inference of intent to distribute as distinguished from mere possession for personal use." *Id.* at 1037.

■ Finally, defendant contends that the section of the code under which he was charged is unconstitutionally vague

2. There is no dispute that the search in San Diego was a private search by American Airlines' employees. After the suitcase was opened, it remained open and it was only then that the police were called.

3. The testimony was that the forty-nine pounds of marijuana when first broken down had a value of $58,000.00, and when broken down to "sticks" or "joints" it would sell for $71,500.00, the "street" value in the area we are concerned with.

or overly broad under the instructions given by the trial court. We have considered this contention but find no merit in it.

For the reasons stated above, the judgment of conviction is affirmed.

HEANEY, Circuit Judge (concurring).

I concur on the grounds that although this search was a governmental one subject to the proscriptions of the Fourth Amendment, the persons executing it had probable cause to carry it out.

In my view, airline singular searches conducted by airline personnel are, in fact, governmental searches. Airlines are public carriers, their routes are allocated by the government, their rates are regulated by the government, and they have no alternative but to comply with governmental regulations, including those requiring airline searches. See, Note, Airport Security Searches and the Fourth Amendment, 71 Colum.L.Rev. 1039, 1041–1047 (1971). Thus, had I been on the panels that decided *Echols* and *Burton,* I would have taken a view that the searches there were governmental rather than private.

There are additional reasons for holding this search to be a governmental one. Effective February 6, 1972, each airline was required by Federal Aviation Regulations to screen passengers and carry-on baggage so that no explosives or weapons would be carried aboard aircraft.[1] As of March 9, 1972, each airline was required to adopt a security program with respect to checked baggage and cargo to accomplish the same end.[2] These regu-

1. Prior to February 6, 1972, the airlines employed screening practices to reduce the probability of air piracy and sabotage. Pursuant to Federal Aviation Regulation § 121.538 issued by the Administrator on January 31, 1972, the implementation of a screening system became mandatory on February 6, 1972:

"§ 121.538 Aircraft security.

\* \* \* \* \*

"(b) Each certificate holder shall, before February 6, 1972, adopt and put into use a screening system, acceptable to the Administrator, to prevent or deter the carriage aboard its aircraft of any sabotage device or weapon in carry-on baggage or on or about the persons of passengers, except as provided in § 121.585."

37 Fed.Reg. 2500, 2501 (1972).

This screening system apparently did not require that the person and carry-on baggage of every passenger be examined, but rather only those who met a profile established by F.A.A. needed to be subjected to a close examination.

2. On February 29, 1972, Federal Aviation Regulation § 121.538 was revised by Amendment 121–85 to require further security precautions. In part, it required:

"§ 121.538 Aircraft security.

\* \* \* \* \*

"(c) Each certificate holder shall prepare in writing and submit for approval by the Administrator its security program including the screening system prescribed by paragraph (b) of this section, and showing the procedures, facilities, or a combination thereof, that it uses or intends to use to support that program and that are designed to—

"(1) Prevent or deter unauthorized access to its aircraft;

"(2) Assure that baggage is checked in by a responsible agent or representative of the certificate holder; and

"(3) Prevent cargo and checked baggage from being loaded aboard its aircraft unless handled in accordance with the certificate holder's security procedures."

37 Fed.Reg. 4904, 4905 (1972).

This amendment was not to be effective until at least April 6, 1972; and by its terms, it would seem that the security program need not have been implemented until specifically approved by the Administrator. However, on March 9, 1972, pursuant to his power under Federal Aviation Regulation § 121.538(g), the Administrator, in response to a statement by the President, announced that:

" \* \* \* the effective date of Amendment 121–85 is being changed from April 6, 1972, to March 9, 1972, and each certificate holder is being required to immediately adopt and put its security program into use. \* \* \*"

37 Fed.Reg. 5254 (1972).

Paragraph (b) of Federal Aviation Regulation § 121.538 was also amended by adding the following sentence:

"§ 121.538 Aircraft security.

. . . . .

"(b) . . . Each certificate holder shall immediately adopt and put into use its security program prescribed in paragraph (c) of this section."

*Id.*

lations which were in effect when this search was made but not when the *Echols* and *Burton* searches were made remove any doubt as to the government's involvement in this search. Even though the search here was conducted by airline personnel, it was carried out at the instigation and direction of the government and should have been conducted in accordance with the Fourth Amendment to the United States Constitution.

It is one thing to hold that the threat of air piracy is so great at the *present time* that the reasonableness standards of the Fourth Amendment permits carefully limited searches of airline passengers, baggage and carry-on luggage for *explosives and weapons in appropriate circumstances* by persons subject to the Fourth Amendment.[3] It is quite another thing to hold that such searches can be routinely conducted by persons uninhibited by the strictures of that Amendment. If we permit the latter, we invite general searches for contraband other than weapons and explosives by those who are uncontrolled by any governmental authority and open up wide avenues for personal harassment and deprivation of constitutional rights.

This case is not the one in which we should lay down a precise standard of reasonableness for airline searches, but it is a case in which it should be made clear that airline searches for firearms and explosives, conducted pursuant to Federal Aviation Regulations since February 6, 1972, are not private searches but are governmental ones for a very limited purpose which must be conducted in accordance with the Fourth Amendment. See and compare, United States v. Moreno, 475 F.2d 44 (5th Cir. 1972); United States v. Gerald Frank Kroll, 351 F.Supp. 148 (W.D.Mo., 1972, amended February 28, 1973); United States of America v. John Kenneth Meulner, 351 F.Supp. 1284 (C.D.Cal. 1972). Any other course of action will permit the person and property of millions of Americans to be searched without regard to constitutional standards. As serious as the air piracy problem is, I am not prepared to close my eyes to Fourth Amendment problems raised by airport searches on the technical grounds that the searches are private because they are conducted by personnel paid by the airlines.

---

3. On December 5, 1972, the Administrator, again acting under the emergency authority given him by Federal Aviation Regulation § 121.538(g), sent a telegram to the F.A.A. Regional Directors directing that commencing January 5, 1973, the carry-on baggage and persons of *all* passengers must be inspected prior to boarding. On this same date, the Administrator also issued an amendment to Part 107 of the Federal Aviation Regulations which required that no later than February 6, 1973, airport managers had to post armed law enforcement personnel at boarding gates. 37 Fed.Reg. 25934, 25935 (1962).