**UNITED STATES of America, Appellee,**

v.

**Ronald BLAKE, Appellant.**

**No. 73–1153.**

United States Court of Appeals, Eighth Circuit.

Submitted June 13, 1973.

Decided Sept. 12, 1973.

Rehearing Denied Sept. 28, 1973.

---

8. See Note 3, supra, and cases cited.

**52**

Gerald Cohen, St. Louis, Mo., for appellant.

Jerome J. Murphy, Asst. U. S. Atty., St. Louis, Mo., for appellee.

Before GIBSON, LAY and ROSS, Circuit Judges.

GIBSON, Circuit Judge.

The defendant was indicted for a violation of 21 U.S.C. § 841(a)(1)[1] for knowingly and intentionally possessing a controlled substance (14.3 grams of 17.3 per cent pure heroin) with an intention to distribute it. The jury returned a verdict of guilty, and the defendant was sentenced to five years imprisonment and a three year special parole term under 21 U.S.C. § 841, to be served concurrently with a state sentence presently being served by defendant.

The defendant was arrested without a warrant in the course of the officers making an arrest with a warrant of another individual occupying the same premises. On November 30, 1972, Leon Phillips, Kenneth R. Bloemker, and Michael W. Hillebrand, Special Agents with the Bureau of Narcotics and Dangerous Drugs, together with Detectives Lester J. Anderson and Lawrence T. Brewer went to 4242A Clarence, St. Louis, Missouri, with an arrest warrant for Willie Vales for possession and sale of heroin. There is conflicting testimony on whether the agents and officers knew that Vales was living alone or with someone else.

All of the agents and officers, except Bloemker, went to the front door of 4242A Clarence, a four-unit dwelling

---

1. Section 841(a)(1) reads:

"(a) Except as authorized by this title, it shall be unlawful for any person knowingly or intentionally—

"(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; . . . ."

with separate outside entrances for each unit, in order to serve the arrest warrant. Bloemker proceeded to the rear of the apartment building to cover against any possible escape. Phillips knocked on the front door, identified himself and the purpose for his presence after a voice answered that sounded like the defendant's,[2] and forced open the front door when no one allowed entry. In the meantime, Bloemker, standing 15 feet below the rear balcony of the apartment at 4242A Clarence, observed the defendant step out onto the balcony and begin to throw a white change purse over the side. Bloemker identified himself as an officer and ordered the defendant to stop. The defendant ducked and immediately reentered the apartment, still carrying the white purse. As Bloemker proceeded to the front of the apartment building, the other agents and officers had already gone upstairs to Apartment A. Agent Phillips saw Vales on a couch in the living room and the defendant in a hallway between the bedroom and kitchen and next to an open laundry chute. Vales was arrested. Bloemker, who had joined the others by this time, told of the incident at the rear of the apartment and asked the defendant where the purse was. The record does not indicate the defendant's response. The agents and officers then searched the apartment and seized a bottle of quinine, a mirror, a vial of powder, and two playing cards—all used in the preparation of heroin for distribution—in plain view on the kitchen table.

Special Agent Hillebrand saw an unlocked door leading from the kitchen, opened it, and went down a flight of stairs into a dark basement. He saw a white change purse under the only open clothes chute of four in the area and seized it. That clothes chute led to Apartment A upstairs, the residence of Willie Vales. The white change purse was in plain view, and a plastic material was extending approximately 1½ inches outside of the closed purse. After Hille-

brand opened the purse and found a plastic bag containing a powdery substance that Hillebrand believed to be a narcotic, the defendant was arrested.

At trial, expert testimony established that the white purse contained 14.3 grams of 17.3 per cent pure heroin and that at this purity it would make 140 ten-dollar bags for "street sale." Further trial testimony revealed that heroin on the street in St. Louis would be sold at about five per cent purity, and that 420 ten-dollar bags or "dime bags" of five per cent purity could be made and sold with the amount of heroin seized from the white purse. The "street" value of the seized heroin, therefore, was $4,200.

The defendant testified that he had never previously seen any of the items seized except the mirror and that he was spending the night in St. Louis with Vales, his first cousin, since he had no transportation to his home in East St. Louis.

The defendant raises two issues on appeal: (a) the purse with its contents was taken in an illegal search and seizure in violation of the Fourth Amendment and was therefore inadmissible, and (b) the evidence was insufficient to prove the defendant had an intention to distribute the seized heroin. We reject both arguments and affirm the conviction.

*Search and Seizure Issue.* Since the officers and agents did not have a search warrant for the apartment, the search of the basement and the seizure of the white purse must fall within one of "a few specifically established and well-delineated exceptions" to the general rule that searches must be judicially approved. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L. Ed.2d 576 (1967) (footnote omitted); *accord,* Root v. Gauper, 438 F.2d 361, 363 (8th Cir. 1971).

The facts in this case form one of those exceptions. One of the common

---

2. Detective Brewer of the East St. Louis Police Department was a lifelong East St. Louis resident and knew both Vales and the defendant.

sense reasons why Hillebrand proceeded downstairs to the basement was his belief that a white purse probably containing narcotics was underneath the clothes chute. The circumstances were suspicious. Bloemker had seen the defendant ready to toss the white purse from the balcony at the rear of the apartment. After the defendant refused to stop, Bloemker saw him reenter the apartment with the white purse. Phillips saw the defendant in the hallway next to the open clothes chute, and after Bloemker told of the incident on the balcony, the white purse could not be immediately seen. The arrest of Vales and the seizure of the heroin paraphernalia in plain view followed. At this point, one of the practical considerations was to find the white purse that probably contained narcotics. The officers could have obtained a search warrant, however the defendant was not under arrest and could have removed or destroyed the white purse. The delay in obtaining a search warrant could certainly have been fatal.

Therefore, the question is whether the facts in this case constitute an exceptional circumstance that allowed the warrantless search of the basement. Before the search of the basement and seizure of the white purse, the officers did not have probable cause to arrest the defendant. However, the failure to find and seize the white purse would have lead to a situation in which possible "evidence or contraband was threatened with removal or destruction. . . ." Johnson v. United States, 333 U.S. 10, 15, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948).

■ Gaines v. Craven, 448 F.2d 1236 (9th Cir. 1971), is factually similar to this case. In *Gaines*, the defendant was confronted in a hallway of an apartment by officers who had an unconfirmed tip that narcotics were being sold there. The officers had neither a search nor arrest warrant. The defendant tossed a package through the apartment's open door and the police rushed into the open apartment and seized the package, which was later found to contain heroin.

The Ninth Circuit upheld the warrantless entry of the apartment on the reasoning that "the package would be destroyed if he [the officer] did not take immediate action." Gaines v. Craven, *supra* at 1237. Similarly, the officers in this case had to find the white purse or risk the probability that contraband would be removed or destroyed. Although the officers here did not see the white purse being tossed down the clothes chute, one officer did see the defendant with the white purse when the defendant reentered the apartment from the balcony porch and another officer observed the defendant in front of the open clothes chute. These facts gave rise to probable cause to believe that defendant might have possessed narcotics and constituted an exceptional circumstance or situation that allowed the warrantless search of the basement and seizure of the white purse.

■ The Supreme Court has not *directly* discussed the issue of whether the probability that narcotics will be destroyed constitutes an exceptional circumstance allowing a warrantless search. However, in Johnson v. United States, *supra,* the Court in discussing exceptional circumstances did say in dicta that *Johnson* did *not* involve "evidence or contraband [that] was threatened with removal or destruction. . . ." Johnson v. United States, *supra* at 15, 68 S.Ct. at 369. Also, in United States v. Jeffers, 342 U.S. 48, 52, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951), the Court said in discussing exceptional circumstances that *Jeffers* did not involve "imminent destruction, removal, or concealment of the property intended to be seized." The reasonable interpretations of these cases lead to the conclusion that narcotics that are threatened with imminent removal or destruction provide an exceptional circumstance justifying a warrantless search.

■ Nor, do we think that Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), alters this rule. In *Vale,* the Court again in dicta, said that "[t]he goods ultimately seized were not

in the process of destruction." Vale v. Louisiana, *supra* at 35, 90 S.Ct. at 1972 (citations omitted). *Vale* may be factually distinguished from this case since it was practical there for the officers to secure a search warrant. Further, it would be imprudent to take the language "in the process of destruction" as a complete description of an exceptional circumstance for this type of narcotics case. First, the quoted language is only a brief comment by the Court that did not apply directly to the facts of that case. Second, to wait until contraband is actually in the process of destruction could possibly forego the opportunity to seize the narcotic. The "imminent removal and destruction" rule satisfies both the need for the exceptional circumstance and the protection of the individual's right to privacy against non-judicially approved searches. Johnson v. United States, *supra*, 333 U.S. at 14–15, 68 S.Ct. 367.

Therefore, not only do the facts of this case constitute an exceptional circumstance allowing the warrantless search, but they also provide a sufficient basis for concluding that the Government has carried its burden in establishing the exceptional circumstance. Vale v. Louisiana, *supra* at 34, 90 S.Ct. 1971.

■■ Merely because it was impractical to obtain a search warrant does not dispense with the requirement that the officer must determine probable cause to search before proceeding with a warrantless search. Vale v. Louisiana, *supra* at 34, 90 S.Ct. 1971; Henry v. United States, 361 U.S. 98, 104, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). The officer in making a warrantless search must have reasonable grounds to believe that the object sought and seized contained contraband. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). In discussing probable cause, the Court in *Brinegar* said:

"In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved." Brinegar v. United States, *supra* at 175, 69 S.Ct. at 1310.

The grounds for probable cause here are generally the same that support the conclusion that an exceptional circumstance existed and need not be repeated. The above enumerated cumulative facts would lead a reasonable man to believe that the white purse probably contained contraband, and therefore the agents and officers properly determined that there was probable cause to search the basement and seize the white purse.

In addition to the circumstances supporting probable cause, the officers and agents had particular reason to believe that narcotics, which were probably contained in the purse, would be destroyed, if not found and seized. The defendant previous to the search of the basement had attempted to throw the white purse over the side of the rear balcony and did not have the white purse on his person when the police arrived inside the apartment. The purse eventually was thrown downstairs in an obvious attempt to conceal it. This is not a case in which "the scope of a search incident to arrest is temporarily expanded where there is a *possibility* that a third-party *may* destroy or conceal evidence." United States v. Davis, 423 F.2d 974, 979 (5th Cir.), cert. denied, 400 U.S. 836, 91 S. Ct. 74, 27 L.Ed.2d 69 (1970) (emphasis added).[3] In this case, the defendant *had* previously attempted to rid himself of the purse twice and was *present* in the apartment for a third attempt, if the officers had left without finding the white purse. Not only was a third-party not involved here as the family of the defendant in *Davis*, but the previous attempts to secrete the purse by the de-

---

3. *Davis* focuses on the temporal expansion of the search, while this case concerns a spatial expansion. The reasoning in *Davis*, however, could be applied to a spatial expansion as well.

fendant, who was on the premises of the search, made the destruction of the white purse much more than a "possibility." This case, therefore, is more like Gaines v. Craven, *supra*, than *Davis*. In *Gaines*, the defendant himself was involved, and he had tried to rid himself of the package by throwing it into an apartment.

■ We agree, as *Davis* stated, that "[t]here is almost always a partisan who might destroy or conceal evidence." United States v. Davis, *supra* at 979. The family members in *Davis* could be considered the *possible* partisans, who might have destroyed the gun that was found by the officers within the yard of the Davis' home. However, there was no indication prior to the search of the yard that any of the family members in *Davis* had attempted to destroy or conceal the gun. In this case, there was not a possible partisan who *might* conceal evidence, but a defendant who *had* attempted to conceal evidence. In short, this case presents the situation, viewed as an exceptional circumstance, in which imminent, not *possible*, removal or destruction of the white purse existed. Imminence should be determined from the totality of the factual circumstances. Time was an important factor in finding the purse, and in addition the officers and agents knew that a particular person, here the defendant, had attempted to conceal the purse that probably contained contraband. Further, the defendant was on the premises of the search and not under arrest.

The Government urges an alternative ground to justify the search and seizure of the white purse. The Government claims that the search was reasonable because the officers originally had a right to enter the apartment to arrest Vales, and once in the apartment and after the arrest of Vales, the search of the basement was also reasonable since the officers had a "right to conduct a quick and cursory viewing of the apartment area for the presence of other persons who might present a security risk." United States v. Briddle, 436 F.2d 4, 7 (8th Cir. 1970), cert. denied, 401 U.S. 921, [91 S.Ct. 910, 27 L.Ed.2d 24] (1971).[4] The seizure of the white purse was justified since it was in plain view. Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

After the defendant and Vales were confronted by officers upstairs and after seizure of the items in plain view on the kitchen table, Agents Bloemker and Hillebrand discussed the incident on the rear balcony and the location of the white purse. Hillebrand testified that he "looked around the kitchen for a white purse and for other people." At this time and in the kitchen, the agents and officers were doubly concerned to find the white purse and to make a security check of the area for possible other persons. Hillebrand further testified during trial that he saw a door in the kitchen that went downstairs, apparently to a basement.[5] Hillebrand said that he and Detective Anderson went downstairs to check for other persons. In the process of making this security check of the basement, they saw the white purse on the floor in "plain view" and under an open clothes chute. Hillebrand picked up the purse, noticed a plastic material protruding 1½ inches outside of the closed purse, opened the purse, and found a brown, powdery substance. Hillebrand took the purse upstairs and showed it to Bloemker, who said that the purse looked like the one that the defendant had on the rear balcony. The defendant was arrested.

---

4. In *Briddle*, the officers did have a warrant to search the apartment, however, this court held that, for the purposes of the opinion, the warrant was invalid since the affidavit was legally insufficient. United States v. Briddle, *supra*, at 7, n. 10.

5. During a hearing on the Motion to Suppress, Hillebrand said that the door was in the hallway next to the kitchen.

■ The Government's alternative justification for the search comports with the reasonableness requirement of the Fourth Amendment. The agents and officers, after announcing their presence and the reason for their presence and not receiving an answer, had a right to enter the apartment to arrest Vales. 18 U.S.C. § 3109; Sabbath v. United States, 391 U.S. 585, [88 S.Ct. 1755, 20 L.Ed.2d 828] (1968); Stamps v. United States, 436 F.2d 1059 (9th Cir. 1971).[6] Once in the apartment, a quick and cursory viewing of the apartment is permissible to check for other persons who might present a security risk. United States v. Briddle, *supra* at 7.[7]

■ In conducting this security check of the basement, the officer and agent saw the white purse in plain view on the basement floor. The seizure of the white purse is justified according to the "plain view" doctrine, for "[i]t has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced into evidence." Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968) (citations omitted). The agent and officer had a right to be in the basement to conduct a security check for other persons and also a right to seize the object, a purse, since it was apparent to them that they had evidence in plain view before them. Coolidge v. New Hampshire, 403 U.S. 443, 466, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Although it was necessary for Hillebrand to open the purse to find the heroin, we have determined that probable cause existed to believe that the purse contained narcotics. Also, the white plastic bag, a common item in narcotics distribution, was protruding 1½ inches outside of the closed purse. This was not a "general exploratory search from one object to another until something incriminating at last emerges." Coolidge v. New Hampshire, *supra* at 466, 91 S.Ct. at 2038.

In addition, the "plain view" doctrine here is applicable, and the search did not violate the limitations on the plain view doctrine. First, the "plain view" doctrine alone did not justify the intrusion into the basement, for Hillebrand testified that they went downstairs to check for other persons. Second, the discovery of the purse under the clothes chute was inadvertent. Coolidge v. New Hampshire, *supra* at 469–470. Although the agents and officers did want to find the white purse, Hillebrand testified that he and Brewer went downstairs to check for other persons. *Briddle* established the right to make this quick and cursory check. No general, exploratory search followed, but the purse was seen in plain sight on the basement floor. The plain view doctrine applied to the search in this case.

*Intention to Distribute Issue.* The defendant's second major argument is that there was insufficient evidence to prove that the defendant intended to distribute the 14.3 grams of 17.3 percent pure heroin. Instead, he claims that the heroin was for his personal use. Central to the defendant's argument is his claim that the only evidence to prove intent was the quantity and street value of heroin seized, which in his view was too small in amount and value to raise an inference or constitute sufficient evidence to prove an intent to distribute.

6. Although 18 U.S.C. § 3109 expressly only deals with the entry of federal officials pursuant to a search warrant, *Sabbath* said "that the validity of such an entry of a federal officer to effect an arrest without a warrant 'must be tested by criteria identical with those embodied in' that statute. Miller v. United States, 357 U.S. 301, 306 [78 S.Ct. 1190, 2 L.Ed.2d 1332] (1958); Wong Sun v. United States, 371 U.S. 471, 482–484, [83 S.Ct. 407, 9 L.Ed.2d 441] (1963)." Sabbath v. United States, *supra*, at 588, 88 S.Ct. at 1757 (foot-note omitted). Similarly, a federal officer's entry into a dwelling to effect an arrest with a warrant should be tested by the same criteria in § 3109.

7. The defendant argues that Chimel v. California, 395 U.S. 752, [89 S.Ct. 2034, 23 L.Ed. 2d 685] (1969), invalidates the search in this case. *Briddle*, however, disposes of this contention. United States v. Briddle, *supra* at 8.

The Government contends that there was sufficient circumstantial evidence, including the amount and street value of the heroin seized, for the jury to infer an intention to distribute the heroin.[8] The Government mainly argues that there was sufficient evidence in addition to the amount and street value of the heroin to demonstrate that the defendant was intending to distribute, instead of personally use or just possess, the heroin.

The Government's view of the evidence supports the verdict. In addition to the amount and street value of the seized heroin; a bottle of quinine, a mirror, and two playing cards—all used in the preparation of heroin for sale, not personal use—were admitted into evidence. Also a chemist testified that, according to over 200 tests that he conducted on narcotics, the average purity of heroin on the street in St. Louis was five per cent. Hillebrand testified that 17.3 per cent pure heroin was not for personal consumption. In addition, the defendant, who testified at trial, did not say he personally used heroin. Even on appeal, the defendant does not *expressly* say that the heroin was for his personal use. He only argues that ducking into the apartment with the white purse shows that he was trying to conceal the heroin, which inferentially *could* be taken to mean that he was concealing the heroin for his own use. All of this above evidence provided other circumstantial evidence, in addition to the amount and street value of the heroin, for the jury to consider in arriving at its verdict.

It was also proper for the jury to consider the amount and street value of the heroin seized as leading to the conclusion that the defendant intended to distribute the heroin. In two recent cases this Court has approved the use of the amount and value of a controlled substance as proper circumstantial evidence to infer an intention to distribute. United States v. Wilkerson, 478 F.2d 813 (8th Cir., 1973); United States v. Echols, 477 F.2d 37 (8th Cir., 1973), cert. denied, —— U.S. ——, 94 S.Ct. 128, 38 L.Ed.2d 58 (U.S., Oct. 9, 1973). The validity of such an inference depends on whether the amount and value of the controlled substance "will support an inference of intent to distribute as distinguished from mere possession for personal use." United States v. Mather, 465 F.2d 1035, 1037 (5th Cir.), cert. denied, 409 U.S. 1085, 93 S.Ct. 685, 34 L.Ed.2d 672 (1972), *quoted in* United States v. Wilkerson, *supra* at 815. In *Mather*, the defendant possessed 197.75 grams of cocaine worth approximately $2,500. In this case, Blake possessed the equivalent of 420 "dime bags" of heroin with a "street" value of $4,200. Such an amount and value was sufficient to support an inference by the jury that the defendant possessed the heroin with an intention to distribute it.

In addition to the above explained reasons why the evidence was sufficient to support the jury's verdict, the District Court properly instructed the jury on the lesser included offense of simple possession of a controlled substance, in this case heroin. The jury chose to find that the defendant was guilty of possession with an intention of distribution. Taking the view of the evidence that is most favorable to supporting the jury verdict, we find that the evidence was sufficient to sustain the verdict. United States v. Valez, *supra* at 627.

Judgment of conviction affirmed.

LAY, Circuit Judge (concurring).

I concur solely on the alternative ground that the seizure of the white purse was justified under the "plain

---

8. The traditional rule on reviewing jury verdicts and the sufficiency of evidence applies to this case. Since there has been a verdict of guilty by the jury, we resolve all conflicts of evidence in favor of the jury verdict, take the view of the evidence that is most favorable to supporting the jury verdict, and accept as established all reasonable inferences that tend to support the jury's verdict. United States v. Valez, 431 F.2d 622, 627 (8th Cir. 1970).

view" doctrine. The police went to the basement solely to see whether other persons presenting a security risk might be present. The officers, thus, had a right to be there. The purse with plastic material protruding from it, which Blake had attempted to conceal, was in plain sight. Their discovery of the same was inadvertent. I cannot justify the seizure on the ground that the police had probable cause to search the basement for contraband because Blake had secreted the purse in the clothes chute. First, neither of the officers who went to the basement saw or even knew that Blake had placed the purse in the clothes chute. Second, the officers went to the basement, not to search for the purse, but to see if any other persons might be there. Simply because the white purse was missing should not give police officers carte blanche to make a general search of the apartment. I dislike relying on a new and questionable doctrine to expand a search beyond the limitations of Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), without proper foundation and, more importantly, when not necessary.