RICHARD I. INGLE *v.* STATE OF INDIANA

[No. 2-876A309. Filed June 26, 1978. Rehearing denied October 25, 1978. Transfer denied January 22, 1979.]

*Terry E. Johnston*, of Valparaiso, for appellant.

*Theodore L. Sendak*, Attorney General of Indiana, *Kenneth R. Stamm*, Deputy Attorney General, for appellee.

## CASE SUMMARY

BUCHANAN, C.J.—Richard I. Ingle (Ingle) appeals from convictions of Conspiracy[1] and Possession of a Controlled Substance with Intent to Deliver, to-wit, Marijuana,[2] claiming that the trial court erred in allowing hearsay testimony prior to the *prima facie* establishment of a conspiracy; in refusing to give his tendered instructions regarding reasonable doubt and circumstantial evidence; in overruling his Motion to Suppress; in admitting evidence of separate crimes; in considering within the presence of the jury whether self-incriminating statements were made voluntarily, and in admitting certain evidence. Ingle also claims the charging information was deficient and at variance with the evidence presented by the State.

We affirm.

## FACTS

Abel Quintero (Quintero) and Ingle had been co-workers and friends in Carroll County, Indiana, for four or five years. Quintero became unemployed and began selling marijuana obtained from Ingle as a source of income.

Some time in 1975 Quintero met undercover police officers Gary

---

1. IND. CODE 35-1-111-1, repealed by Acts 1976, P.L. 148, § 24, effective October 1, 1977.

2. IND. CODE 35-24.1-4.1-10, repealed by Acts 1976, P.L. 148, § 24, effective October 1, 1977.

Ashenfelter (Ashenfelter) and Russell Ricks (Ricks). Following two or three transactions between Quintero and the officers, involving only minor quantities of marijuana, he, Ricks and Ashenfelter discussed a possible transaction involving larger quantities.

On May 2, 1975, Quintero, Sorenson and Jim Ebrite met at a motel in Lafayette, Indiana to discuss a price. After negotiating, they arrived at a price of Seven Hundred Fifty ($750.00) Dollars for five (5) pounds of marijuana. Following departure of the rest of the individuals, Quintero called Ingle from the motel to inform him of the proposed transaction and for assurance that Ingle had the desired quantity of marijuana.

The next day, May 3, 1975, Quintero and Sorenson met Ricks and Ashenfelter at a gas station in Delphi, Indiana. Quintero, driving alone in his own automobile, left to pick up the marijuana. Sorenson accompanied the police officers to the "meeting spot." Later, on a country road in northeast Carroll County, Quintero, driving Ingle's automobile, arrived with the marijuana and sold it to the undercover police officers. Quintero and Sorenson were arrested.

Following their arrest Quintero and Sorenson were taken to the Carroll County jail where Quintero informed the police officers where he had gotten the five pounds of marijuana (from Ingle) and where Ingle lived. He then drew a map showing Ingle's residence.

Ricks and Ashenfelter, accompanied by four or five other officers, all of whom were dressed in plain clothes, then left to visit Ingle. Arriving at the Ingle residence the officers were met at the back door by Ingle who asked them their business. Ashenfelter's reply was that he had just been "ripped off" by Quintero and that he intended to take Quintero's automobile which was parked at the Ingle residence in lieu of the marijuana. Ingle informed them that they were not to take Quintero's car. An altercation ensued and ended only when someone inside the house, prompted by a request from Ingle, appeared at the back door with a shotgun. After further discussion Ingle invited the undercover officers into his home for a discussion of the "problem" and to wait for Quintero's return.

After entering the residence the officers, and five individuals who were with Ingle in the house prior to the arrival of the officers, sat in

the family room of the residence and discussed the problem. At one point Ingle apparently believing Ashenfelter's story about Quintero having "ripped him off", stated "there must be some sort of mistake—if you've been ripped off I've been ripped off." Inside the house the officers observed, in plain view, a terrarium with what appeared to be several marijuana plants growing in it. On the bar in the family room was a plastic bag containing still more marijuana.

Ingle then told his younger brother to "go get us some joints." The officers observed the younger Ingle open a door, heard him walk down into the basement; then heard him come up to the stairs into their view again. Upon his return to the family room two or three minutes later the younger brother possessed two hand rolled marijuana cigarettes. The marijuana was lit, passed around and smoked; soon thereafter all, including Ingle, were arrested.

Following the arrests, the officers went down to the basement to see whether anyone else was in the house. There they discovered in plain view a set of scales and approximately five pounds of marijuana reposing in an open suitcase lying on a work-bench. It was this marijuana for which Ingle was convicted of Possession with Intent to Deliver.

At trial Quintero testified that the five pounds of marijuana sold by him, and forming the basis for the conspriacy charge, were obtained from Ingle. Quintero also testified that Ingle had been in contact with him during the negotiations over price between Quintero, Ashenfelter and Ricks. After the price was agreed on, Quintero testified that he called Ingle to make arrangements to pick to the marijuana for delivery. In picking up the marijuana at Ingle's house a switch was made to Ingle's car at Ingle's suggestion.

Quintero also testified that the Seven Hundred Fifty ($750.00) Dollars, had the deal gone smoothly, was to be returned to Ingle. Quintero and Sorenson were to receive Twenty-five ($25.00) Dollars each for their efforts.

### DECISION

*ISSUE ONE*—Did the trial court err in refusing to suppress the marijuana seized in Ingle's basement?

*PARTIES' CONTENTIONS*—Ingle contends that his Motion to Suppress the marijuana found in his basement was improperly denied because the initial entry into his house was the result of deceit and deception.

The State counters by saying the search was reasonable as the marijuana was in plain view and in danger of being removed.

*CONCLUSION*—The trial court did not err in overruling Ingle's Motion to Suppress the marijuana discovered in Ingle's basement.

The police officers took Quintero and Sorenson to the Carroll County jail following their arrest. Quintero then told them that he was driving Ingle's car, that his car was located at Ingle's house, and that he had obtained the marijuana from Ingle. He gave the police officers directions to the Ingle residence.

These facts prompted the officers to go to Ingle's house to investigate further.

Although the police officers engaged in a charade which resulted in their invitation to enter the house, the deception practiced by them to gain entry did not vitiate the consent to enter. The United States Supreme Court has held that police officers need not identify themselves as such and a person suspected of criminal activities of this type has no right to be told his licensees are police officers. One engaged in such activities takes his chances as to whom he invites into his residence for illegal purposes. Misrepresentation of identity by undercover agents does not violate Fourth Amendment rights. *Lewis v. United States* (1966), 385 U.S. 206, 87 S.Ct. 424; *United States v. Quintana* (7th Cir. 1975) 508 F.2d 867; *Grzesiowski v. State* (1976), 168 Ind.App. 318, 343 N.E.2d 305.

Once inside the house, the officers were supplied with marijuana and saw marijuana in plain view. Thus the warrantless arrests were justified on the basis that the officers saw a felony being committed in their presence. *Smith v. State* (1971), 256 Ind. 603, 271 N.E.2d 133; *Jenkins v. State* (1977), 172 Ind.App. 544, 361 N.E.2d 164.

Furthermore, the officers testified that they suspected additional per-

sons were present in the house. Under Indiana case law one present in a house in which officers saw marijuana growing in the open could, under certain circumstances, be found to be in constructive possession of that marijuana. *Thomas v. State* (1973), 260 Ind. 1, 291 N.E.2d 557; *Martin v. State* (1978), 175 Ind.App. 503, 372 N.E.2d 1194. Therefore, the officers were justified in walking through the house in search of others.

Upon entering the basement in search of suspects, the officers saw large quantities of marijuana in plain view in an open suitcase on a bench. Any object in plain view of a police officer who has proper justification to be in a position to afford that view is properly subject to seizure. *Ford v. State* (1971), 257 Ind. 498, 275 N.E.2d 808; *Alcorn v. State* (1970), 255 Ind. 491, 265 N.E.2d 413. *See also Bruce v. State*, (1978), 268 Ind. 180, 375 N.E.2d 1042.

*ISSUE TWO* — Was the charging information specific enough to give sufficient notice to Ingle?

*PARTIES' CONTENTIONS* — Ingle next argues that the Information charging him with count one (Conspiracy) was insufficient to inform him of the specifics of the crime charged. The State responds that, under the modern rules of pleading, the details as specified were fully adequate to allow Ingle to prepare his defense.

*CONCLUSION* — The charging information was sufficiently specific to provide notice of the evidence of the conspiracy to be relied upon by the State.

Omitting formal parts, the information stated:

> On or about the 3rd of May, 1975, in Carroll County, in the State of Indiana, Richard I. Ingle did unite with Abel L. Quintero, Jr. for the purpose of committing a felony within the State of Indiana, to-wit: to knowingly, unlawfully and feloniously deliver to Special Agent Russell Ricks and Special Agent Gary Ashenfelter a controlled substance, to-wit: marijuana of an aggregate weight of 5 pounds, which is 2268 grams being more than 25 grams of said substance, in violation of the Indiana Uniform Controlled Substances Act, Schedule I, said delivery being made on County Road 625W near County Road 500N.

An indictment or information must "state the facts and circumstances" which underlie the charged offense. *Kain v. State* (1954), 234 Ind. 160, 123 N.E.2d 177; *Wilson v. State* (1975), 164 Ind.App. 665, 330 N.E.2d 356.

The requirement is not so rigidly observed as to preclude minor variances which do not mislead the defendant or do not omit an essential element. *Moore v. State* (1973), 260 Ind. 154, 293 N.E.2d 28; *Payne v. State* (1970), 254 Ind. 100, 257 N.E.2d 818.

In *Gubitz v. State* (1977), 172 Ind.App. 343, 360 N.E.2d 259, we held that an information charging conspiracy must only "be so certain and particular as to enable the accused, the court and the jury to determine the crime for which conviction is sought." 360 N.E.2d at 266-7. The information in question is sufficiently specific and is not misleading. *Gubitz, supra.*

*ISSUE THREE* — Did the evidence relied upon by the State create a fatal variance with the charging information?

*PARTIES' CONTENTIONS* — Ingle claims the evidence offered at trial was at variance with the information in that it showed the existence of a third party (Sorenson) rather than only a single conspiracy between Ingle and Quintero as charged.

The State does not respond.

*CONCLUSION* — The evidence relied upon by the State does not create a fatal variance with the charging information.

This argument is without merit.

There was ample evidence showing Ingle supervised and participated in the May 3rd deal. The mere fact of the presence of Sorenson in the May 3rd deal does not create a fatal variance between the indictment and proof of the conspiracy. *See Payne v. State* (1970), 254 Ind. 100, 257 N.E.2d 818; *Anderson v. State* (1966), 247 Ind. 552, 217 N.E.2d 840.

*ISSUE FOUR* — Did the trial court err in refusing certain instructions tendered by Ingle?

*PARTIES' CONTENTIONS* — Ingle argues that his Instruction No. 7, dealing with circumstantial evidence, and his Instruction No. 9 on

reasonable doubt should have been given to the jury as he was entitled to have the jury instructed on these matters.

The State replies that these instructions were not required as "reasonable doubt" was covered by other instructions given by the court and the State did not totally rely upon circumstantial evidence.

*CONCLUSION* — The trial court did not err in refusing Ingle's tendered Instructions 7 and 9.

Ingle's tendered Instruction No. 7[3] related to circumstantial evidence.

No instruction concerning the force and effect of circumstantial evidence is required if there is direct evidence to prove a crime. *Beavers v. State* (1957), 236 Ind. 549, 141 N.E.2d 118. The testimony by Quintero constituted direct evidence linking Ingle to the crimes charged, so no error was committed in refusing Ingle's tendered Instruction No. 7.

Ingle's Instruction No. 9, dealing with reasonable doubt, read:

You are hereby cautioned by the Court that mere probabilities are not sufficient to warrant a conviction. It is neither sufficient that the greater weight or preponderance of the evidence supports the allegations of the affidavit, nor that maybe it is more probable that the Defendant is guilty than innocent.

The defendant is presumed innocent until proven guilty beyond

---

3.　With regard to circumstantial evidence the jury is entitled or may draw reasonable inferences which flow from the facts established in this cause.

A fact in the nature of an inference may not be taken as the basis of a new inference until the first inference has the required basis of a proven fact. That is to say the process of drawing inferences is a two-step process. The fact which is the basis of the inference must be established. Until that fact as a basis is established and proven, the jury is not entitled to draw any inferences therefrom.

The fewer the opposing facts the safer and more conclusive is the assumption based upon circumstantial evidence. That is to say if there are one or more proven facts which oppose or contradict the facts which form the basis of the inference which is sought; the less reliable, conclusive and probative is the inference sought to be drawn.

The jury is instructed that in making up their minds from circumstantial evidence if they have a rational doubt as to the existence as to any one or the material circumstances attempted to be proven beyond a reasonable doubt by the prosecution; that circumstance ought not to have any influence in their deliberations.

a reasonable doubt, consequently, evidence that is as consistent with innocence as with guilt is insufficient to sustain a conviction, and unless there is substantial evidence of facts which exclude every reasonable hypothesis but guilt, it is your duty to return a verdict for the defendant.

The guilt of the Defendant is not to be inferred because the facts proved are consistent with his guilt but, on the contrary, before there can be a verdict of guilty you must believe from all the evidence and beyond a reasonable doubt that the facts proved are inconsistent with their innocence. If two conclusions can reasonably be drawn from the evidence, one of innocence and one of guilt, you should adopt the former.

The trial court's instruction dealing with reasonable doubt read:

A reasonable doubt is such a doubt as you may have in your mind when having fairly considered all of the evidence, you do not feel satisfied to a moral certainty of the guilt of the defendant. It is not every doubt, however, that is a reasonable one. You are not warranted in considering as reasonable those doubts that may be merely speculative or products of the imagination. A reasonable doubt arises, or exists in the mind, naturally, as a result of the evidence or lack of evidence. There is nothing in it that is mysterious or fanciful. It does not furnish a shield for those actually guilty whereby to escape merited punishment. It does not contemplate absolute or mathematical certainty. Despite every precaution that may be taken to prevent it, there may be in all matters depending on human testimony for proof, a mere possibility of error. Reasonable doubt is a real misgiving that the evidence does not satisfy the conscience of a juror to such an extent that he would be willing to act upon such evidence in the most important and vital matters relating to his own affairs, where there was no compulsion upon him at act at all.

Ingle seeks a stronger statement of the degree of certainty of guilt. However, an instruction need not include a specific reference to the degree of juror certainty required. *Randolph v. State* (1977), 266 Ind. 179, 361 N.E.2d 900; *Lash v. State* (1977), 174 Ind.App. 217, 367 N.E.2d 10.

*Tolliver v. State* (1976), 171 Ind.App. 235, 355 N.E.2d 856, cited by Ingle in support of his contention of error in refusing to give such an instruction was expressly overruled by *Lash*.

In addition, the trial court's instruction adequately covered the subject.

*ISSUE FIVE*—Did the trial court err in allowing the testimony of Quintero prior to the establishment of a *prima facie* case?

*PARTIES' CONTENTIONS*—Ingle argues that the State failed to establish, by either direct or circumstantial evidence, the existence of the conspiracy prior to offering the testimony of the co-conspirator Quintero.

The State responds that the testimony of Quintero was direct evidence of the conspiracy between Ingle and Quintero. Therefore, the evidence of the conspiracy was properly received.

*CONCLUSION*—The trial court did not err in allowing the testimony of Quintero.

Ingle's position is that the State failed to establish the *prima facie* existence of conspiracy prior to the admission of the testimony of Quintero. At trial, Ingle objected to the testimony of Quintero on the grounds that no prior foundation was laid and that the testimony was hearsay.

While it is true that independent evidence of a conspiracy must be shown before the *out-of-court statements* of a co-conspirator may be admitted, *Patton v. State* (1961), 241 Ind. 645, 175 N.E.2d 11; *Howe v. State* (1917), 186 Ind. 139, 115 N.E. 81, such a rule is merely an exception to the "hearsay rule" and is not applicable when the testimony offered (as here) is the *direct testimony* of the co-conspirator. *Wolfe v. State* (1974), 161 Ind.App. 317, 315 N.E.2d 371. *See also Smith v. State* (1961), 241 Ind. 601, 174 N.E.2d 47; *Smith v. State* (1974), 159 Ind.App. 438, 307 N.E.2d 875.

*ISSUE SIX*—Did the trial court err in refusing to hold a hearing to determine whether statements made by Ingle were voluntary?

*PARTIES' CONTENTIONS*—Ingle contends that IND. CODE 35-5-5-1 as to the admissibility of confessions was violated by the trial court's refusal to hold a hearing in order to determine whether certain statements made by Ingle were voluntary.

The State's answer is that this statute is inapplicable as the statements were made prior to Ingle's arrest.

*CONCLUSION* — The trial court did not err in refusing to hold a hearing to determine whether the statements made were voluntary.

IND. CODE 35-5-5-4 provides:

Nothing contained in this act [35-5-5-1 — 35-5-5-5] shall bar the admission in evidence of any confession made or given voluntarily by any person to any other person without interrogation by anyone, or at any time at which the person who made or gave such confession was *not under arrest or other detention.* (emphasis supplied)

Consequently, IND. CODE 35-5-5-1, which mandates a determination by the trial judge outside the jury's presence on any issue of voluntariness,  is not applicable if a confession or self-incriminating statement is made when the person is not under arrest or detention.

Ingle was not under arrest or detention when the statements in question were made. Thus, no error.

*ISSUE SEVEN* — Did the trial court err in allowing testimony of criminal acts other than those charged?

*PARTIES' CONTENTION* — Ingle's next contention is that admission of evidence of criminal acts other than those charged was improper as no *prima facie* case of conspiracy was established and that the evidence was irrelevant.

The State says the evidence of other crimes was admissible to show intent, motive, purpose or common scheme and plan.

*CONCLUSION* — There was no error in the admission of evidence of other crimes.

The evidence of which Ingle complains is the marijuana obtained by the police officers in the basement of the Ingle residence, and testimony of Quintero in describing previous drug dealings with Ingle.

Obviously the marijuana obtained in the basement was the basis for the charge of Possession with Intent to Deliver, and we have already indicated that evidence thereof was properly admitted. In view of the charge it could hardly be described as irrelevant.

As for the testimony of Quintero in which he told of prior similar drug related activities between himself and Ingle, such evidence is an exception to the general rule of exclusion of evidence of separate and distinct crimes because it is evidence tending to show a common scheme or plan to the charge of Conspiracy to Deliver Marijuana. *Willis v. State* (1977), 267 Ind. 439, 370 N.E.2d 906; *Manuel v. State* (1977), 267 Ind. 436, 370 N.E.2d 904.

*ISSUE EIGHT*— Was there error in admitting certain evidence without a requisite showing of the proper chain of custody?

*PARTIES' CONTENTIONS*— Ingle argues the police failed to establish a proper chain of custody of the marijuana found at his residence because the container was identified with the wrong case numbers.

*CONCLUSION*— There was no break in the chain of custody of the marijuana.

A necessary prerequisite for introducing evidence of a fungible nature is that a proper chain of custody be established. *Rinard v. State* (1976), 265 Ind. 56, 351 N.E.2d 20.

If there is evidence which strongly suggests the whereabouts of the exhibit at all times, no more is required. *Butler v. State* (1972), 154 Ind.App. 361, 289 N.E.2d 772.

The only indication of a "break" in the chain of custody occurred when a laboratory technician testified that he inadvertently placed the wrong case number on the exhibit. The result was not a break in the chain of custody. The exact whereabouts of the exhibit at all times was established by detailed testimony.

*ISSUE NINE*— Did the trial court err in admitting the marijuana seized from Quintero?

*PARTIES' CONTENTIONS*— Ingle's *last* argument is that the trial court erred in admitting the five pounds of marijuana seized from Quintero because the State failed to establish a conspiracy between Quintero and Ingle prior to the admission into evidence of the marijuana.

The State responds to the contrary.

*CONCLUSION* — There was no error in admitting the marijuana into evidence as the State had, by direct testimony, shown a *prima facie* case of conspiracy.

The record reveals that, *prior* to the admission of the marijuana into evidence, Quintero testified that he had obtained marijuana from Ingle. This was sufficient.

Judgment affirmed.

Sullivan, J. Concurs.

Staton, J. Concurs.

## ON PETITION FOR REHEARING

BUCHANAN, C.J. — We use this opportunity to expand upon the justification for the warrantless police search of Ingle's basement. See this court's opinion of June 26, 1978, reported at 377 N.E.2d 885.

It is still our conclusion that the officers were justified in walking through the house in search of other suspects. *See People v. Block* (1971), 6 Cal.3d 239, 491 P.2d 9; *Guevara v. Superior Court* (1970), 7 Cal.App.3d 245, 86 Cal.Rptr. 657; *People v. Mann* (1969), 61 Misc.2d 107, 305 N.Y.S.2d 226. As stated in *People v. Mann, supra:*

> Arrest gives the police the right to search the person and the immediate surroundings of the arrestee, surveillance of a prisoner and the right to check for confederates or accomplices extends that right to permit the police an over-all-view of the other rooms in the premises, with a concomitant right to seize evidence or weapons in plain view.

305 N.Y.S.2d at 232-33.

Furthermore, the officers had a right to make a security check of the basement for persons who could pose a threat to their safety. Courts have consistently upheld this right to make a security check. *See U.S. v. Blake* (8th Cir. 1973), 484 F.2d 50, *cert. denied* (1974), 417 U.S. 949; *U.S. v. Christophe* (2d Cir. 1972), 470 F.2d 865, *cert. denied, Pierro v. U.S.* (1973), 411 U.S. 964, and *Panica v. U.S.* (1973),

411 U.S. 964; *U.S. v. Miller* (D. C. Cir. 1971), 449 F.2d 974; *U.S. v. Briddle* (1970), 436 F.2d 4, *cert. denied* (1971), 401 U.S. 921.

In *U.S. v. Blake, supra,* a case with many similarities to the present case, the court stated:

Hillebrand further testified during the trial that he saw a door in the kitchen that went downstairs apparently to a basement. Hillebrand said that he and Detective Anderson went downstairs to check for other persons. In the process of making this security check of the basement they saw the white purse [which contained heroin] on the floor in "plain view" and under an open clothes chute.
. . .

The Government's . . . justification for the search comports with the reasonableness requirement of the Fourth Amendment. . . . Once in the apartment, a quick and cursory viewing for the apartment is permissible to check for other persons who might present a security risk.

484 F.2d at 56-57.

In the present case, the police officers were faced with a large number of people present on the premises, at least one of whom was suspected of dealing in drugs and one of whom had displayed a shotgun. Under these circumstances, it was permissible for the police to make a cursory search of the basement to determine if other persons were present who could pose a threat to the police.

Petition for Rehearing denied.

Staton, J. (by designation) Concurs.

Sullivan, J. Concurs.

NOTE — Reported at 377 N.E.2d 885.