**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Mickey John RYAN, Defendant-Appellant.**

**No. 72-2414.**

United States Court of Appeals, Fifth Circuit.

May 15, 1973.

out in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and applied by this court in United States v. Ramos, 448 F.2d 398 (5th Cir., 1971). The trial court did not err in allowing the identification testimony to go to the jury, and defendant's other points of error are without merit. Ryan's conviction is, therefore, affirmed.

Morton A. Orbach (Court-Appointed), Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Charles Farrar, Harold F. Keefe, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before JONES, GODBOLD and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

Defendant-appellant Mickey John Ryan appeals from his conviction by a jury of conspiring to violate and of violating 21 U.S.C. §§ 841(a)(1) and 846 [1] and 18 U.S.C. § 2 [2] in connection with his participation in a scheme to purchase and distribute cocaine. The most significant issue [3] presented by this appeal is whether the trial court erred in allowing an agent of the Bureau of Narcotics and Dangerous Drugs (BNDD) to testify in court concerning an out-of-court voice identification of the defendant when the conversation which served as the basis for comparison, and hence the identification, contained incriminating statements obtained in violation of defendant's Fifth Amendment rights as set

### I.

On March 11, 1972, BNDD Agent Constantine Kritikos, acting undercover, went to the residence of John Black in Apollo Beach, Florida, to negotiate for the purchase of cocaine. He was accompanied by a government informer. In the course of his conversation with Mr. Black, Kritikos learned that Black had a partner who was hiding in the bedroom. The partner was described as a thirty-three year old white man. Before leaving Black's home Agent Kritikos was given a Miami telephone number to call regarding future cocaine transactions.

On March 14, 1972, about 7:30 in the evening, Agent Kritikos called the Miami number given him by John Black and asked to speak to Black. The person answering the phone identified himself as "Mickey, John's partner," and informed Kritikos that the pending cocaine transaction was moving along well and to call back at 9:30 that same evening. (This was the first contact between Agent Kritikos and the defendant Mickey Ryan, and this telephone conversation forms the basis upon which Kritikos was later able to identify Ryan's voice.)

---

1. Sec. 841(a)(1) provides:
   "(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
   "(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."
   Sec. 846 provides:
   "Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

2. This statute provides:
   "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
   "(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

3. Other issues will be discussed *infra.*

Later in the evening on March 14 Ryan was arrested at the Executive Inn Motel in Miami. The events leading to his arrest can be summarized briefly. BNDD undercover agents Baumwald and Starratt went to a room in the Executive Inn at 5 P.M. on the 14th and acquired a sample of cocaine from two persons, Runion and Price. The agents returned to the same room at 7 P.M. and purchased 234 grams of cocaine from the same two men. It was agreed that another sale would be made later that evening. At 11:45 P.M. the undercover agents returned to the room to make the final purchase. Runion and Price were present but the cocaine had not yet arrived. After a short wait someone knocked at the door and Runion left the room. Although Agent Baumwald did not see an actual transfer of cocaine, defendant Ryan was observed standing outside the door in the motel hallway, and when Runion returned he had a package of cocaine with him. Ryan was arrested a few minutes later outside the motel.[4]

After his arrest Ryan was taken to the BNDD office in Miami and was given Miranda warnings for at least the second time. He declined to sign a waiver of rights form. Agent Kritikos then asked the defendant several questions. The following are excerpts from the agent's testimony which was taken outside the jury's presence:

[Defense counsel]

"Q. Go ahead.

[Agent Kritikos]

A. I said, 'You are Mickey?' He said, 'Yes.' I said, 'You're John's partner that came down from Apollo Beach,' and I made a derogatory remark about the Buick they came down in. He said, 'Yes.' That's all he said.

I asked him who was his connection for the cocaine. He wouldn't say anything. I asked him where they were going to go with the money. He wouldn't say anything. So with other questions along those lines, he wouldn't answer them.

Now I asked him how old he was and he advised me that he was thirty-three. And then I said, 'You're John's thirty-two year old partner?' He said, 'Yes.' . . .

[Government counsel]

Q. Then, is that when you asked him, 'What's your name?

A. Yes, sir—No, sir. No. I said, 'You're Mickey?' He said, 'Yes.'

Q. And did you mention any telephone conversation you had with him?

A. Yes, sir. I said—that's right—'You're the guy that talked to me on the phone. I'm Gus. Remember?' And he said 'Yes.'

Q. Then what did you say?

A. And 'You're the guy that came down with John from Apollo Beach in that beat up Buick.' That—

Q. What did he say?

A. 'Yes.'

Q. And then what did you ask him?

A. 'How old are you?

Q. What did he say?

A. 'Thirty-three.'

4. Ryan makes an unconvincing argument that there was not probable cause for his arrest. We hold that probable cause was established because the arresting officers were aware of the following facts:
    (1) that Black was working with a partner; (2) that Ryan had been seen with Black throughout the evening of March 14; (3) that Black and Ryan together had entered the motel just prior to the 7 P.M. transaction and (4) that Black and Ryan had entered had left shortly after its completion; the motel just prior to the midnight transaction; (5) that Price and Runion were waiting for delivery of the cocaine prior to the arrival of Black and Ryan at midnight; (6) that cocaine was transferred to Runion shortly after the arrival of Black and Ryan; (7) that either Black or Ryan had been seen carrying a brown overnight bag; (8) that Runion had obtained the cocaine for the midnight sale from someone just outside the motel room; (9) that Ryan was observed standing in the hallway just outside the motel room.

Q. What did you say then?

A. 'You're the thirty-two year old partner of John's that was up in the house hiding in the bedroom, is the way I put it, 'in Apollo Beach.'

Q. What did he say?

A. 'Yes.' "

## II.

■ In United States v. Ramos, 448 F.2d 398 (5th Cir., 1971), we held that incriminating statements made in response to government instigated interrogation,[5] after defendant's refusal to sign a waiver of rights form, were inadmissible. A government investigator is *Miranda* bound to cease interrogation once the defendant indicates that he wishes to remain silent. Miranda v. Arizona, *supra,* 384 U.S. at 473–474, 86 S.Ct. 1602; United States v. Ramos, *supra,* 448 F.2d at 399. *See* United States v. Phelps, 443 F.2d 246 (5th Cir., 1971). The trial court properly ruled that Ryan's answers to the questions asked by Agent Kritikos were inadmissible under this standard. Ryan's answers were incriminating admissions obtained as a result of government instigated interrogation after Ryan had refused to sign a waiver of rights form.

We are not faced with the precise *Ramos* problem, however, because the agent's questions and Ryan's answers were not admitted into evidence. The narrow question is whether these incriminating statements could be part of a voice exemplar used for identification purposes.

## III.

■ Our analysis begins with the row settled proposition that a defendant can be compelled to give a voice exemplar

without any violation of his Fifth Amendment protection against self-incrimination. United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1972) [1972]; United States v. Mara, 410 U.S. 19, 93 S.Ct. 774, 35 L. Ed.2d 99 (1972). *See* United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263 (1967); Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1967); United States v. Sanders, 477 F.2d 112 (5th Cir., 1973); United States v. Walker, 453 F.2d 1205 (5th Cir., 1972). If Agent Kritikos had talked to Ryan about the weather or some other equally innocuous subject, and based his voice identification on that conversation, we would have no trouble upholding the identification.[6] The peculiar problem here is that Ryan's answers to the pointed questions asked by Agent Kritikos tended to confirm that he was, in all probability, the same man Kritikos had talked with just six hours earlier on the telephone. The crux of the issue is, therefore, whether the agent's identification was based on the content rather than the sound of his conversation with Ryan.

■ The answer to this question turns on the credibility accorded the agent's testimony, heard outside the presence of the jury, that his identification was founded on the sound of Ryan's voice rather than the communicative aspects of the conversation. We assume, as did the trial court, that *Ramos* would preclude the introduction of in-court identification testimony had the court determined that the identification was the product of the communicative nature of the conversation. The court concluded, however, that the out-of-court identi-

---

5. *Compare* United States v. Ramos, *supra,* . with United States v. McDaniel, 463 F. 2d 129 (5th Cir., 1972); United States v. Devall, 462 F.2d 137 (5th Cir., 1972); United States v. Tafoya 459 F.2d 424 (10th Cir., 1972). *McDaniel, Devall* and *Tafoya* teach that the Ramos rule is not to be applied *per se.* The question is whether the interrogation which occurs

after the defendant's refusal to sign the waiver form is government instigated.

6. This is exactly the procedure the agent should have followed in this case in his effort to make a voice identification. Our affirmance of Ryan's conviction should not be considered as an approval of the agent's conduct.

fication was the product of a voice comparison. We have examined the record in this case and hold that this finding is not clearly erroneous. The lower court had the benefit of observing Agent Kritikos on the witness stand and of examining him first hand to test the basis for his identification. Under close questioning by the court and by both government and defense counsel, Agent Kritikos maintained, and gave sufficient support for, his position that his identification was based on the sound of defendant's voice.[7] On this record the

7. The following excerpts from the agent's testimony establish a sufficient basis on which the trial court could conclude that the identification was the product of a voice comparison:

"EXAMINATION
[Out of jury's presence]
BY MR. ORBACH:

Q. Mr. Kritikos, at the headquarters, when you began speaking with Mr. Ryan, how did you know that it was Mr. Ryan?

A. He identified himself to me.

Q. That was the first question that you asked him, right?

A. Yes, sir.

Q. How did you know that he was the fellow that you spoke to on the phone?

A. I recognized his voice.

Q. What was the first question you had asked him?

A. "Are you Mickey?"

I stated, "You are Mickey," something like that.

Q. You hadn't heard his voice prior to that, had you?

A. Just on the telephone.

Q. Then he said, "I'm Mickey"?

A. He said, 'Yes.'

Q. He said, 'Yes.'?

A. Yes.

THE COURT: What words have you heard this man speak other than on the telephone, as you say?

THE WITNESS: After the three questions which he only answered, 'Yes', he advised me that he wasn't going to answer any questions.

THE COURT: What did he say?

THE WITNESS: He said, 'I don't know anything about any cocaine. I don't know anything about a house in the Gables' or—Yes. Well, he didn't say, 'Gables.' Coconut Grove, I believe. He didn't know anything about any dope; he doesn't know anything about any Cuban connections.

THE COURT: Did he say these things?

THE WITNESS: Yes, sir. And that's it. All this only lasted five or ten minutes maximum.

BY MR. ORBACH:

Q. Let me ask you something. Was it helpful to you when this fellow said that he was Mickey and the guy who spoke to you, the guy who came down with John?

A. Was it helpful?

Q. Yes, in identifying him.

A. Just the 'Yes' part, the one word?

Q. No, the three questions, two or three questions that we are talking about.

A. Was it helpful? That didn't positively identify him for me, sir.

Q. I didn't ask you if it positively identified him. I assume this and the phone conversation, put the two together and you knew you had the right man.

A. The conversation we had after this also.

Q. The conversation also that followed?

A. Yes, sir.

Q. In other words, taking the whole thing in conjunction, there was no question but the fact that this was the same guy that you spoke to over the phone previously the past day?

A. Yes, six hours before.

Q. The first two questions of the identification and the fact that he was the one that spoke to you on the phone; right?

A. Yes.

Q. After the first two questions were you satisfied this was the same fellow that you spoke to over the phone?

A. Not till we finished our conversation.

Q. Of course by that time he was saying he didn't want to talk to you.

A. He didn't want to answer specific questions that were directed to him.

. . .

Q. Were you looking to have him admit that he spoke to you on the phone?

A. After I spoke to the gentleman a few minutes I recognized his voice; right. That was already established.

Q. You recognized his voice. You said a 'few minutes.' How much into the conversation had you gotten when you recognized his voice?

A. I couldn't say. The conversation only lasted ten minutes, maybe.

Q. How far into the conversation would you say this is the same fellow I spoke to on the phone?

court's decision to credit the agent's testimony is not clearly erroneous. There is therefore no basis on which the agent's testimony should have been excluded because the identification was not the result of the *Ramos* proscribed questioning.

## IV.

■■ For purposes of judicial economy—and in the likely event that Ryan will at some time seek relief under § 2255—we think it appropriate to comment on several related issues not raised directly by defendant's appellate brief. After Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed. 411 (1972), it is apparent that Ryan did not have a right to the presence of counsel at the pre-indictment confrontation with Agent Kritikos. *Kirby* holds that pre-indictment confrontations are not "critical stages" of the prosecution at which the presence of counsel is constitutionally required. But, the absence of a requirement for counsel does not remove the defendant from the broad protection of the due process clause. The *Kirby* Court explicitly recognized this principle when it stated:

> "What has been said is not to suggest that there may not be occasions during the course of a criminal investigation when the police do abuse identification procedures. Such abuses are not beyond the reach of the Constitution."

*Id.* at 690, 92 S.Ct. at 1883.

The Court then reiterated its view that "it is always necessary to 'scrutinize any pretrial confrontation . . . .'" 406 U.S. at 690–691, 92 S.Ct. at 1883, citing United States v. Wade, 388 U.S.

at 227, 87 S.Ct. 1926. The standard on which to scrutinize pretrial confrontations is found, according to *Kirby,* in Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The *Stovall* standard has its foundation in the due process clause of the Fifth and Fourteenth Amendments. If pretrial confrontation procedures are "unnecessarily suggestive and conducive to irreparable mistaken identification," then they violate due process of law. 388 U.S. at 302, 87 S.Ct. at 1972. The thrust of this due process protection is to assure against pretrial confrontation procedures which may lead to a mistaken identification of a defendant. The pretrial confrontation in the instant case was not conducive to a mistaken identification of defendant Ryan as a participant in the cocaine distribution scheme.[8] For this reason Ryan cannot look to the rationale underlying *Stovall* for a basis upon which to assert that the identification testimony here should have been excluded.

## V.

Ryan's other assertions of error are without merit. In United States v. Amando Lopez, 459 F.2d 949 (5th Cir., 1972), we held that 18 U.S.C. §§ 841(a)(1) and 846 were constitutional. Congress did not exceed its constitutional power "by creating federal narcotics offenses that do not require proof of a specific nexus with interstate commerce as a prerequisite for conviction." United States v. Alberto Lopez, 461 F.2d 499, 500 (5th Cir., 1972). The rationale for this holding is that it would be a futile exercise to attempt to separate intrastate from interstate activities, and that such

A. A little more than half way through.

Q. By that stage, what was he saying to you when you first realized that this was the same guy that spoke to you?

A. He didn't know about any cocaine or any Cuban connections, like that. When he was talking about Cuban connections, he also was mentioning words we had used on the phone, saying the same words."

8. "[A] claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it . . . ." Stovall v. Denno, 388 U.S. 302, 87 S.Ct. 1972. For an excellent, practical guide to the problems encountered in pretrial confrontations which lead to identification, see Sobel, Eye-Witness Identification—Legal and Practical Problems (1972).

an attempt would substantially interfere with and obstruct the power of Congress to regulate interstate commerce. 459 F.2d at 951. *See* Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1961).

■ Count One of the indictment, the conspiracy count, charged that Ryan had "a tacit understanding" with several other persons to violate the previously discussed statutes. Ryan seems to argue that a tacit agreement cannot be an element of conspiracy and thus Count One is insufficient and should have been dismissed. The basis for this position appears to be the erroneous notion that the conspiracy must be bottomed on an actual overt agreement to commit a crime. Defendant also appears concerned that because the dictionary definition of "tacit" implies something done in silence, without words, he could be convicted for an unknowing participation in a criminal scheme. This latter concern is unfounded. The indictment charged that Ryan "knowingly, intentionally, and willfully" conspired with others to violate the statute. Furthermore, the court's jury instructions carefully emphasized that Ryan's participation in the criminal activity had to be knowing and intentional. Finally, it is unnecessary for a conspiracy to be bottomed on an express or formal agreement. Oral statements of agreement are equally unnecessary. It is enough if a conspiracy to commit a crime can be inferred from the circumstances present in a given case.

■ Ryan next contends that the trial court erred while instructing the jury on intent. The court stated:

"Intent, ordinarily may not be proved directly. There is no way of fathoming the operations of the human mind. You may infer the defendant's intent from the surrounding circumstances. *You may consider any statement made or omitted by the defendant at the time; and I don't think*

*there is any particular evidence of any statement.* You may consider all the facts and all the circumstances in evidence from which you may be able to arrive at your conclusion following the charges of law as to the intent at the time." (Emphasis supplied.)

Ryan objects to the italicized portion of this statement. He argues that it was a comment on his silence at the time of his arrest and on his failure to testify, thus violating his Fifth Amendment right against self-incrimination. Assuming arguendo that the charge was erroneous in the first instance, the court cured the error when, after suggestion by defense counsel, it clarified the statement to the jury by explaining that a defendant has no duty to make a statement.

■ When considering possible error in a court's charge, the reviewing court must examine the charge in its totality and should not isolate possible erroneous statements from the context in which they were made. We have examined the entirety of the court's charge here and find it completely fair to the defendant. Any prejudice flowing from the attacked portion of the charge was inconsequential when viewed against the charge as a whole.[9]

■ Finally, Ryan argues that the court should have required the government to disclose the name of the government informer who accompanied Agent Kritikos to John Black's residence on March 11. The court informed defendant's counsel that it would require the government to produce the informer if he so desired. The record reveals that counsel decided, after consulting with the defendant, that the delay which would have resulted from producing the informer was not worth having the informer present. The court was sufficiently accommodating to the interests of the defendant. Its decision not to disclose the name of the informer was, on the facts here, a proper place to strike the balance

---

9. For an example of a charge that we held unfair, compare United States v. Williams, 473 F.2d 507 (5th Cir., 1973) [1973], and cases cited therein.

between the government's need to keep an informant secret (both for the government's and the informer's sake) and the defendant's desire to know more about the informant.

· The defendant's conviction is in all respects affirmed.