### UNITED STATES of America, Appellee,

v.

### Robert Dale MARCHILDON, Appellant.

No. 74–1628.

United States Court of Appeals, Eighth Circuit.

Submitted March 11, 1975.

Decided July 8, 1975.

Rehearing and Rehearing En Banc Denied Aug. 4, 1975.

Robert J. Milavetz, Minneapolis, Minn., for appellant.

John M. Lee, Asst. U. S. Atty., Minneapolis, Minn., for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, ROSS, Circuit Judge, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

The defendant was convicted, after jury trial, of possession of a controlled substance, amphetamine, with intent to distribute.[1] His appeal covers a broad range of asserted errors. We find no prejudicial error in the case and we affirm.

On February 15, 1974, in the execution of a search warrant at defendant's lake cabin near Nisswa, Minnesota, both the defendant's house and garage were searched. In the latter was found, in a portable barbecue stand, a shaving kit containing a variety of drugs, including some 3,000 amphetamine tablets, as well as marijuana and hashish. In the house, on the bureau at the foot of defendant's bed, were found cocaine, amphetamine tablets, and a small amount of marijuana. The indictment returned related only to the amphetamines.

At the outset the defendant challenges the sufficiency of the affidavit in support of the search warrant. The affidavit was prepared by Drug Enforcement

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. 21 U.S.C. § 841(a)(1); see 21 U.S.C. §§ 811, 812.

Administration Agent Fekete and, save for the formal parts, stated as follows:

Richard A. Fekete, being first duly sworn, deposes and says that:

I am a Special Agent of the Drug Enforcement Administration of the United States Justice Department and that I have received information supplied by a confidential informant, who has supplied information to a FBI agent on over 100 occasions over the past 14 years which information has been proven accurate through independent investigation and which information has led to the successful prosecution of at least three Federal Criminal cases. The above informant prior to November 1973 stated to the FBI agent that he had acquired personal knowledge through his observations and conversations with Robert Dale MARCHILDON that MARCHILDON is heavily involved in the illegal sale and transportation of cocaine in the State of Minnesota. This informant further advised at that time that MARCHILDON makes a weekly cocaine pick up in Minneapolis each Thursday. On Thursday, November 8, 1973, Steven Brannan, FBI Agent, observed a white male put a package into the trunk of a white over black 1973 Ford LTD, Minnesota License 5FG 646 at approximately 11:00 A.M. at a parking lot at 414 Hennepin Avenue, Minneapolis, Minnesota. At approximately 12:00 Noon that day, MARCHILDON arrived and was observed to enter the car and drive it to Nisswa, Minnesota. The informant had previously advised that MARCHILDON owned a residence about 2 miles outside of Nisswa, Minnesota. This informant has advised FBI agent Richard Anderson that within the past month he visited MARCHILDON at his residence located approximately 2 miles from Nisswa, Minnesota and purchased cocaine from MARCHILDON at this time.

On 2/14/74 at approximately midday, FBI Agent Steven Brannan observed MARCHILDON drive the above described vehicle to 6220 West 34th Street in St. Louis Park, Minnesota. At this time, MARCHILDON went into the residence located at the above address shortly thereafter MARCHILDON exited the residence, carrying a package under his arm and proceeded to the above described vehicle. He opened the trunk and placed the package in the trunk and then covered the package with several blankets. The package is a large manila envelope, approximately 12″ x 16″ inches and about 1″ thick. At this time MARCHILDON was observed to be carefully observing activity on the street in the immediate vicinity of that address. MARCHILDON then drove away from this residence and was followed to Nisswa, Minnesota and was observed driving into a private lane which leads to his residence otherwise described as Lot 15, Whitstrom Addition to Nisswa (government Lot 6, Section 15) Crow Wing County, Minnesota. MARCHILDON resides in A-frame cabin with a two-car attached garage located on the above described lot. FBI investigation disclosed that MARCHILDON purchased the above residence and is using it as his homestead.

A second confidential informant who has supplied information to the FBI on over 100 occasions in the past 6 years which information has proven accurate through independent investigation and which information has led to the successful prosecution of at least three Federal Criminal cases and at least 2 State of Minnesota Criminal cases advises that he has personal knowledge that MARCHILDON currently deals in large quantities of cocaine and within the last month observed a large quantity of cocaine in the presence of MARCHILDON at the above described residence.

This cooperating individual has additionally advised FBI Agent Richard Anderson that it is MARCHILDON's modus operendi [sic] to drive to Minne-

apolis on Thursday of each week and obtain a large quantity of cocaine.

This cooperating individual has advised SA Richard Anderson of the FBI that he has purchased quantities of cocaine from MARCHILDON on various occasions during the last year.

██ Defendant argues that the statements as to his involvement in the sale and transportation of cocaine in the State of Minnesota, his weekly Thursday pick ups, and his current dealings in large quantities of cocaine, are mere conclusions devoid of facts in support thereof, relying on *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and thus inadequate for a finding of probable cause. The allegations, however, as to the Minneapolis pick ups are corroborated. Although, without more, it might be argued that the pick ups were innocent in nature, the informants' alleged personal knowledge of defendant's possession and sales of cocaine in and from his house go beyond speculation or conclusion and into the area of personal knowledge.[2]

It is also argued that the phrase "within the last month," referring to defendant's possession and sale, is "fatally indefinite" in that it might refer to the unknown date of the informants' disclosures to Agent Fekete. The test as to time is that of close contemporaneity to the application for the warrant.[3] In the light of the allegations made, particularly as to defendant's continuing activities,[4] and viewing the affidavit as a whole, we cannot say that the requirement as to time has been violated.

We do not scrutinize an affidavit as a doctoral thesis. We ask only whether the information furnished by an informant, taken as a whole in the light of all of the circumstances disclosed, can be said to be reliable.

The affidavit need only establish the *probability* of criminal activity and secreting of evidence on specific premises, not proof beyond a reasonable doubt. *See, e. g., Harris, supra,* 403 U.S. at 584, 91 S.Ct. 2075; *Spinelli, supra,* 393 U.S. at 419, 89 S.Ct. 584; *Jones [Jones v. United States],* 362 U.S. 257, 270, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Draper v. United States, supra,* 358 U.S. [307] at 311–312, 79 S.Ct. 329 [3 L.Ed.2d 327] (1959); *Brinegar v. United States,* 338 U.S. 160, 172–173, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *McCreary v. Sigler, supra* [8 Cir.], 406 F.2d [1264] at 1268. *United States v. Smith,* 462 F.2d 456, 460 (8th Cir. 1972).

So tested, the affidavit before us clearly justified the issuance of the warrant under *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) and *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

██ Conviction for the offense of knowingly or intentionally possessing amphetamine with intent to distribute requires both possession of the contraband and the necessary intent. 21 U.S.C. § 841(a)(1). No substantial issue is made as to possession, but the defendant challenges the evidence that the alleged contraband was in fact amphetamine. He argues that "the only evidence" thereof was that of the Government's expert, Mr. Gaston, who so testified.[5] Mr. Gaston described the tests employed by him, as well as his interpre-

---

**2.** [B]efore the trial we deal only with probabilities that "are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

*United States v. Harris,* 403 U.S. 573, 582–83, 91 S.Ct. 2075, 2081, 29 L.Ed.2d 723 (1971).

**3.** 8A J. Moore, *Federal Practice,* ¶ 41.05[1], at 41–38 (1975) and cases therein cited.

**4.** *See United States v. Harris,* 403 U.S. 573, 579 n.*, 91 S.Ct. 2075, 29 L.Ed.2d 723.

**5.** *Cf.* Mr. Gaston's testimony respecting the identification of certain substances as heroin in *United States v. Kirk,* 496 F.2d 947, 950–51 (8th Cir. 1974). The admission of testimony as "expert" rests in the discretion of the trial judge. *United States v. Burden,* 497 F.2d 385, 387 (8th Cir. 1974).

tations thereof. His testimony was challenged by the defendant's witnesses and the usual battle of the experts ensued. We are asked to rule on the validity of his tests, his procedures and his conclusions, but we do not reach these issues. In defendant's statements to Agent Nelson, who was at the time processing him prior to his appearance before a magistrate and subsequent to his being given the *Miranda*[6] warnings, he, the defendant, stated "that in the process of the execution of the warrant the Special Agents had discovered around 3000 amphetamine tablets," that "he had obtained them in Minneapolis the day before * * * and he had transported them to Nisswa himself," and that he "took maybe one or two a day for the purpose of weight reduction and weight control."[7] The admission made removes from the case any question as to what the substance was.[8] The defendant himself identified it as amphetamine, the controlled substance named in the indictment.

Defendant argues vigorously for the suppression of such statements, asserting that they have "undermined Defense Counsel's contention that defects in the chemical analysis and identification of the tablets seized raised a reasonable doubt that the tablets were amphetamines as charged in the indictment." It is asserted that the precepts of *Miranda,* and his Fifth and Sixth Amendment rights have been violated in that he was interrogated following his "invocation of his Fifth Amendment right to remain silent" and that he was denied the right to counsel following "his attempted, but unsuccessful invocation of that right."

Motions to Suppress were the subject of extensive hearings on July 8, 9, and 13, 1974. It appeared from such hearings that a short time after the arrest, Agent Fekete, employing the standard "Your Rights" form used by government agents, warned defendant of his rights. The defendant himself testified the warning was actually given him and was understood by him.[9]

■ With respect to defendant's argument that he had fruitlessly invoked his right to remain silent, the trial court

---

6. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

7. There was testimony in the case that tablets of amphetamine are used for such purposes.

8. Defendant asserts that it was error to permit testimony before the jury that defendant had been advised of his constitutional rights. The trial court permitted the showing upon the ground that "The jury has a right, if they have a statement before them, to know the circumstances under which they were made." In this procedure there was no error. *See United States v. Williams,* 484 F.2d 176, 179 (8th Cir.), *cert. denied,* 414 U.S. 1070, 94 S.Ct. 581, 38 L.Ed.2d 475 (1973).

9. THE COURT: Mr. Marchildon, let me ask you a few questions that don't have anything to do with the transactions.

How old are you?

THE WITNESS: I am forty-six (46).

THE COURT: You appear to me to be an intelligent man and a strong character and had some advantages in the way of education. How far did you go as to schooling?

THE WITNESS: I graduated from the University of Montana with a degree in Business.

THE COURT: What I am getting at here is when the Agent explained your Constitutional rights to you in regard to making the statements, you understood his explanation as to what your rights were, that you had a right to keep your mouth shut and not make any statements, and had a right to a lawyer, and if you didn't have the money to hire one, the Government would furnish one for you, and if you wanted to answer a few questions or make a few statements you had a right to stop at any time and consult with a lawyer? You understood his explanation to you?

THE WITNESS: I did, but I thought it applied to idle conversation when we were discussing hunting or fishing or anything not pertaining to anything but idle conversation.

THE COURT: So you understood it?

THE WITNESS: I am sure Mr. Fekete and Mr. Braseth can testify to the fact that I didn't give them a hard time and acted very nice through the whole thing and didn't act nasty. I listened to everything.

THE COURT: You are at ease here, aren't you?

THE WITNESS: Yes.

THE COURT: You are not under fear of anything?

THE WITNESS: No, I am not.

found no such invocation in the record. Agent Fekete, who had given defendant the *Miranda* warning, testified that discussion was had that morning as to "our desire to have him cooperate with us," meaning by that, Fekete said, to inform on others. To this the defendant replied, "You know I can't do that." [10] We agree with the trial court that his refusal to talk clearly related only to his sources of supply. However, even were the view taken that defendant's meaning was that he did not wish to talk concerning any phase of the case, he obviously talked freely to the agents during the day with full knowledge of his *Miranda* rights. That he did so, that he "chose of his own free will to speak," should now give him no cause for complaint. [11]

■ When defendant, after his *Miranda* warning, was asked if he had an attorney, he replied that he had, saying "I have used him before." The Agent understood that he was going to use the same counsel in this case. That defendant expressed an intention to employ the services of counsel with respect to the instant matter does not itself prohibit interrogation, as we held in *United States v. Scogin,* 459 F.2d 182 (8th Cir.), *cert. denied,* 409 U.S. 865, 93 S.Ct. 159, 34 L.Ed.2d 114 (1972):

> She [defendant] chose to submit to interrogation after attempting to call her attorney. * * * The mere fact that she was unsuccessful in reaching an attorney does not prohibit interrogation where it is clear that she knowingly, intelligently, and voluntarily elected to proceed without one.

459 F.2d at 184. *United States v. Montos,* 421 F.2d 215, 224 (5th Cir.), *cert. denied,* 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970); *Klingler v. United States,* 409 F.2d 299, 308 (8th Cir.), *cert. denied,* 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969). It is clear from the record before us that defendant was not concerned about his representation by counsel and elected to answer questions without his presence.

■ In this respect defendant complains, as well, that he was never specifically asked if he chose to waive his right to counsel before making a statement. There is no such requirement. Waiver depends on no form of words, written or oral. It is to be determined from all of the surrounding circumstances. Addressing ourselves to this issue we held in *Hughes v. Swenson,* 452 F.2d 866, 867–68 (8th Cir. 1971) that:

> The thrust of appellant's claim is that a valid waiver cannot be effective absent an expressed declaration to that effect. We are cited to no case which supports appellant's thesis and independent research discloses none. To the contrary, the Fifth, Seventh, Ninth, and Tenth Circuits have held in effect that if the defendant is effectively advised of his rights and intelligently and understandingly declines to exercise them, the waiver is valid.

> Our case of *Klingler v. United States,* 409 F.2d 299, 308 (8th Cir.), cert. denied, 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969), although not directly on point, is informative and indicative that we would not adopt a rule requiring the prosecution in every case to establish that the defendant, after being effectively informed of his rights, expressly declined the services of an attorney.

A sound analysis of the waiver issue is recorded in *United States v. Montos,* 421 F.2d 215, 224 (5th Cir.), cert. denied, 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970). Judge Ainsworth summarized his discussion of the basic elements to be considered by observing:

> "An express statement that the individual does not want a lawyer is not required, however, to show that the individual waived his right to have one present. *See Bond v. United*

---

10. In response to questions later by Agent Nelson, defendant "told me [Nelson] not to bother asking him who his source was because he wouldn't tell me * * *."

11. *Klingler v. United States,* 409 F.2d 299, 308 (8th Cir.), *cert. denied,* 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969).

*States,* 10 Cir., 1968, 397 F.2d 162, 165. All that the prosecution must show is that the defendant was effectively advised of his rights and that he then intelligently and understandingly declined to exercise them. *See Carnley v. Cochran,* 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962)."

421 F.2d, at 224. [Footnotes omitted.]

■ The requirements for waiver are not formalistic but substantive. The critical question is whether the prosecution has borne its heavy burden of effectively advising the defendant of his rights and demonstrating that the defendant knowingly and voluntarily declined their exercise.[12] The prosecution, we hold, sustained its burden. We find no coercion or overreaching by the officers, but rather what defendant himself characterizes as "idle conversation" between them. Defendant concedes that the *Miranda* warnings were given and understood. It is pertinent to observe at this point that defendant was a college graduate, 47 years of age, and, the trial court noted, "relaxed and at ease on the witness stand." The court below conducted a careful and extensive inquiry

into the matter, and concluded that defendant waived his constitutional rights covered by the *Miranda* warning.[13] We find no error in this ruling.

■ As to the required intent to distribute, the evidence[14] showed that of the 3,277 amphetamine tablets seized, 2,945 were in three plastic bags containing about 1000 tablets each; that such 1000-tablet bags are sold at the wholesale level for subsequent distribution to retailers; that the retailers break down the 1000 packages into bags of 100, which are then sold to the peddler who in turn disposes of them in quantities of three to twenty-five at a time, "whatever the traffic will bear;" that the three bags of approximately 1000 amphetamine tablets have a total street value of $1,000 and a wholesale value of $450.

As to defendant's argument that the tablets were for his personal use, it was testified that individuals do not purchase bags of 1000 tablets for personal use, but rather in smaller amounts; that for an extremely "high" sensation, illicit users take from three to ten of the type of tablets introduced into evidence, that if an individual took several hundred of

---

12. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.

   *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966).

13. The District Court specifically found, in more detail, that:

   (1) A full and complete *Miranda* warning was given by the arresting officer at the time the defendant was taken into custody, and before he made any statement at all.

   (2) The defendant admitted that he understood his rights covered by the *Miranda* warning.

   (3) The defendant was a mature, well educated, business man with a college degree. His self-confidence was evidenced by the fact that he testified that he was relaxed and at ease while on the witness stand, as well as by his demeanor.

   (4) There was never any attempt by the officers at any time to deny or evade the defendant's constitutional rights.

   (5) The statements in question were not the product of compulsion, subtle or other-

wise. There were no threats, promises, cajoling, harassment, grilling, prodding or other type of pressure. There was never any discourteous treatment of defendant.

   (6) None of the defendant's statements made while in custody was in the nature of a grudging response by him to persistent questioning by the officers. Statements similar to the ones admitted in evidence were volunteered by the defendant during the three hour trip with DEA Agents from Nisswa to Minneapolis earlier in the day. The defendant testified that such in-custody statements as he made to any of the officers were just part of "idle conversation." [Footnote omitted.]

14. In our review of the evidence we view the facts in the light most favorable to the verdict of the trier of the fact, accept as established all reasonable inferences that tend to support the decision of such trier and resolve all evidentiary conflicts in favor of the verdict. *United States v. Hutchinson,* 488 F.2d 484, 489 (8th Cir. 1973), *cert. denied,* 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974).

this type "he would suffer a drug intoxification which would possibly kill him;" that a "hard-core speed freak" (amphetamine user) can take 500 of the type of tablets introduced into evidence in 25 days; that if an amphetamine user took 1000 of such tablets over a 50 day period he would be emaciated, paranoid, and show the effect of body poisoning; that heavy amphetamine users suffer loss of appetite, body emaciation, and extreme paranoia, whereas defendant at trial appeared slightly overweight at approximately 255 pounds and did not appear to have been involved in the daily overuse of amphetamine tablets nor to have taken numerous speed trips.

We find the evidence adduced sufficient to support the jury's rejection of defendant's argument that the tablets were for his personal use, and its finding, rather, of his intent to distribute. The defendant urges to us asserted deficiencies in the testimony relating to the amount of amphetamine, in grams, involved, arguing that an inference of intent to distribute cannot be drawn from the amount of what he terms the "alleged" amphetamine involved in this case, "assuming, but not conceding, it is 12 grams." [15] Defendant argues that "The amount of amphetamine possessed necessary to support an inference of intent to distribute must be substantially larger than 12 grams," citing to use such cases as *United States v. Wilkerson*, 478 F.2d 813 (8th Cir. 1973), involving 49 pounds of marijuana, compared to which an amount of only 12 grams is indeed small. But obviously the weight of the

amphetamine is not conclusive as to its use or effects. The cases relying on weight of contraband, without substantially more [16] should not be read to hold that weight is the sole factor involved. We look beyond the apothecary's scales. Where, as here, the ingestion of a relatively few tablets of the type and potency before us may have physical effects [17] we are not restricted to weight alone in appraising intent to distribute.

■ The case of *Turner v. United States*, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970) involving, in part, distribution in violation of former 26 U.S.C. § 4704(a) [18] is of some guidance in this area, indicating that the weight of the substance involved may have a probative value with respect to the intent to distribute,[19] but the ultimate question as to intent remains to be resolved, as we held in *United States v. Blake*, 484 F.2d 50 (8th Cir. 1973), *cert. denied*, 417 U.S. 949, 94 S.Ct. 3076, 41 L.Ed.2d 669 (1974), upon all of the evidence adduced.[20]

During the search a variety of other drugs were discovered, both in the garage and in the house. In the bedroom, in addition to amphetamine tablets, were found five cocaine capsules and a vial of marijuana; in the garage, in addition to amphetamine tablets, were found marijuana, hashish, sodium pentobarbital and tetracycline. With respect to the additional drugs, which were introduced into evidence, the Court charged the jury that the substances other than amphetamine, some of which had been identified as cocaine, marijuana, and hashish were

---

**15.** This figure is a rough approximation, derived from assuming a total of about 3000 tablets, each containing approximately 4 milligrams of amphetamine.

**16.** *E. g., United States v. Echols*, 477 F.2d 37, 40 (8th Cir.), *cert. denied*, 414 U.S. 825, 94 S.Ct. 128, 38 L.Ed.2d 58 (1973), involving approximately 200 grams of cocaine.

**17.** In response to the question, "An amphetamine user doesn't go on speed trips with one or two or three amphetamines, does he?" Agent Fekete testified, "It depends upon the individual's prior use of the drug, his body weight, his assimilation of the drug, the strength of the drug." The "speed trip" re-

ferred to involves hallucinating or experiencing "wild or strong rushes throughout the body."

**18.** Act of August 16, 1954, ch. 736, 68A Stat. 550 (repealed 1970).

**19.** *See Turner*, 396 U.S. at 423, 90 S.Ct. 642; *United States v. Welebir*, 498 F.2d 346, 350–51 (4th Cir. 1974).

**20.** "All of this above evidence provided other circumstantial evidence, in addition to the amount and street value of the heroin, for the jury to consider in arriving at its verdict." *Blake*, at 58.

admitted for the limited purpose of bearing upon defendant's intent to distribute.[21]

■ Defendant urges that it was error to allow the introduction into evidence of the additional drugs since, in a criminal prosecution, proofs tending to show the defendant guilty of other crimes are inadmissible for the purpose of showing the commission of the crime charged. *Kempe v. United States*, 151 F.2d 680, 687 (8th Cir. 1945). Such is settled law, but it is also well settled, as we held in *United States v. Cochran*, 475 F.2d 1080, 1082 (8th Cir.), *cert. denied*, 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973) that:

> [T]he trial court can in its discretion admit relevant evidence of other criminal acts and reversal is only commanded when "it is clear that the questioned evidence has no bearing upon any of the issues involved." *Wakakson v. United States*, 367 F.2d 639, 645 (8th Cir. 1966), *cert. denied*, 386 U.S. 994, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967). The trial court in determining admissibility weighs the prejudicial effect against the probative value of the evidence of the other criminal conduct. *Drew v. United States*, 118 U.S.App.

D.C. 11, 331 F.2d 85, 90 (1964). In applying this weighing analysis, trial courts are aided by recognized exceptions to the admissibility of evidence of other crimes or criminal conduct. Such evidence is relevant to prove "(1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, and (5) identity of the person charged with the commission of the crime on trial." *Drew v. United States, supra*, 331 F.2d at 90 (footnote omitted), *quoted* in *Love v. United States, supra* [8 Cir.], 386 F.2d [260] at 266; *United States v. Lewis*, 423 F.2d 457, 459 (8th Cir. 1970); Proposed Rules of Evidence for United States Courts and Magistrates, Rule 404(b), 51 F.R.D. 315, 346.

■ Here the substances introduced were seized at the same time and place as the amphetamines. They were a part of the drug array gathered at defendant's domicile, pertinent "to complete the story of the crime on trial by proving its immediate context, or the 'res gestae,'" McCormick, Evidence 448 (2d ed. 1972)."[22] As such they were properly

---

21. The Court charged the jury in part as follows:

> Intent ordinarily may not be proved directly because there is no way of fathoming or scrutinizing the operations of the human mind, but you may infer the defendant's intent from the surrounding circumstances. You may consider any statement made and done and all of the facts and circumstances in evidence which indicate his state of mind. It is ordinarily reasonable to infer that a person intends the natural and probable consequences of acts knowingly done.
>
> In that connection, the Court admitted evidence here that with this substance which the Government says is amphetamine, the officers found some other substances, some of which have been identified in the testimony as being cocaine, marijuana, and still other was hashish, which is a more concentrated form of marijuana. That evidence was submitted to you or admitted for your consideration for a limited purpose. That is, it was admitted only on the question of whether the defendant had an intent to distribute the amphetamine tablets. It is up to you to

say whether that evidence does support the conclusion that he possessed those things for the purpose of distribution and you have to determine the credibility of it, the evidence relating to it, and the weight to be given it. Of course that includes determining whether or not the substances were actually the ones that were identified by the witness—in other words, whether they were cocaine, marijuana or hashish.

> If the jury should find beyond a reasonable doubt from the other evidence in the case that the accused did possess the substance alleged to be amphetamine, and that such substance was amphetamine, then the jury may consider evidence of the alleged cocaine, alleged marijuana and alleged hashish, if the jury believes that those other substances were those things, in determining the intent with which the accused possessed the amphetamines.

22. *United States v. Howard*, 504 F.2d 1281, 1284 (8th Cir. 1974).

placed before the jury for the limited purpose stated by the court, namely, for consideration, with other facts in determining the defendant's intent. We cannot say that the proof of this assortment of drugs in defendant's possession was foreign to an intent to distribute. Certainly it was a factor to be weighed. In their introduction, so limited as to purpose, there was no error.

We have examined with care the other issues presented and find them without substantial merit.[23]

Affirmed.

---

**23.** The trial court's instruction on the burden of proof followed well-established principles. *Holland v. United States,* 348 U.S. 121, 139–40, 75 S.Ct. 127, 99 L.Ed. 150 (1954). The appellant complains of the rejection of some five circumstantial evidence instructions submitted to the court. "Contrary to the assertion of appellant, the trial court did not need to instruct the jury more particularly upon the probative force of circumstantial evidence. *United States v. Jones,* 418 F.2d 818, 825–826 (8th Cir. 1969)." *United States v. Smith,* 462 F.2d 456, 462 n. 4 (8th Cir. 1972). In this respect we note, moreover, that in our judgment the evidence does, in fact, exclude every reasonable hypothesis other than that of guilt and is ample to warrant a jury's finding that defendant was guilty beyond a reasonable doubt.

The trial court's rejection of defendant's tendered Instruction 15 that the jury must find, for guilt, that "the substance alleged to be amphetamine has traveled across state lines, was intended for distribution across state lines, or otherwise affected interstate commerce" was proper. *United States v. Mather,* 465 F.2d 1035, 1037 (5th Cir.), *cert. denied,* 409 U.S. 1085, 93 S.Ct. 685, 34 L.Ed.2d 672 (1972); *United States v. Ryan,* 478 F.2d 1008, 1014–15 (5th Cir. 1973), relying on *United States v. Lopez,* 459 F.2d 949 (5th Cir.), *cert. denied,* 409 U.S. 878, 93 S.Ct. 130, 34 L.Ed.2d 131 (1972); *see United States v. Richardson,* 477 F.2d 1280, 1281–82 (8th Cir.), *cert. denied,* 414 U.S. 843, 94 S.Ct. 104, 38 L.Ed.2d 82 (1973).